# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

UNITED STATES OF AMERICA

VS.                                    CRIMINAL NO. 3:15CR69-HTW-FKB-1

SAM WAGGONER

**PLEA HEARING**

BEFORE THE HONORABLE HENRY T. WINGATE
UNITED STATES DISTRICT JUDGE
AUGUST 21ST, 2015
JACKSON, MISSISSIPPI

APPEARANCES:

FOR THE GOVERNMENT:   MR. DARREN J. LAMARCA
                      MR. J. SCOTT GILBERT

FOR THE DEFENDANT:    MR. NICHOLAS R. BAIN

REPORTED BY:  MARY VIRGINIA "Gina" MORRIS, RMR, CRR
              Mississippi CSR #1253

_____

501 E. Court, Suite 2.500
Jackson, Mississippi  39201
(601) 608-4187

**EXHIBIT "D"**

1   8/21/15 signifying the date that he too signed this document.

2          I will make the plea agreement a part of the usual

3   record, and I will make the plea supplement a part of the

4   confidential record pursuant to the local rules of court.

5          Now, then, I turn to the factual basis for your plea,

6   Mr. Waggoner.  I told you back when I advised you of all your

7   various rights that if you determine to enter a plea of guilty,

8   that I will be required to satisfy myself that your plea meets

9   the elements of the crime charged.  And I have also advised you

10  as to what those elements are.

11         So I will ask the prosecution to stand and tell me

12  what constitutes a crime by your conduct, and that is a crime

13  as charged by the criminal information.  When Mr. LaMarca is

14  going -- Mr. LaMarca or Mr. Gilbert?  It's going to be

15  Mr. Gilbert.

16         When Mr. Gilbert finishes, then I am going to ask you

17  whether you agree with his statements.  And then I'm going to

18  go a bit further.  I'm going to ask you to tell me in your own

19  words what you did to make you guilty under this criminal

20  information.  All right.  Mr. Gilbert.

21         MR. GILBERT:  Your Honor, had this case gone to trial,

22  the United States would have proven that at all times relevant

23  to this information Christopher B. Epps was the commissioner of

24  the Mississippi Department of Corrections, a state agency that

25  received more than $10,000 each calendar year in funding from a

1   federal grant or in relation to a federal program.

2          The evidence would show that on or about

3   December 13th, 2005, Global Tel-Link, or GTL, was awarded a

4   contract by the Mississippi Department of Information

5   Technology Services on behalf of the Mississippi Department of

6   Corrections to provide inmate phone services for multiple MDOC

7   facilities, including Parchman, Central Mississippi

8   Correctional Facility and South Mississippi Correctional

9   Facility. The contract with GTL was renewed multiple times and

10  was in effect throughout the time covered by this criminal

11  information.

12          In 2011 the defendant, Sam Waggoner, became a paid

13  consultant for GTL. Shortly after Waggoner became a consultant

14  for GTL, Waggoner began paying Epps kickbacks from a portion of

15  Waggoner's consulting salary from GTL. These kickbacks were

16  paid by Waggoner in order to curry favor with Epps for the

17  purpose of influencing Epps' decisions regarding GTL and its

18  contract with MDOC.

19          The evidence would show that both Waggoner and Epps

20  had a financial incentive to ensure that GTL receive as much

21  money as possible from its MDOC contract. As compensation from

22  GTL, Waggoner received 5 percent of GTL's monthly revenue from

23  the MDOC contract.

24          Waggoner would withhold 30 percent of his monthly pay

25  from GTL to cover his tax liability and he would give Epps half

1    of the remaining money from GTL as a kickback each month.   At

2    various times Waggoner paid Epps as much as $3,400 a month.

3    Waggoner made these cash payments to Epps at various locations,

4    including at Epps' home in Flowood, Mississippi.

5          Waggoner's total income from GTL as its consultant was

6    in excess of the $5,000 threshold requirement for Title 18,

7    United States Code, Section 666.

8          Evidence in the form of wiretapped conversations

9    between Epps and Waggoner would show that during the time

10   period Waggoner was paying Epps, Waggoner routinely discussed

11   with Epps the need to expand the telecommunication services GTL

12   was providing to MDOC.

13         For example, Waggoner lobbied Epps to allow GTL to

14   provide video visitation and communication services between

15   inmates and their visitors.   This service would have allowed

16   friends and family members to visit with inmates over

17   Internet-based video feeds instead of requiring travel to the

18   respective prisons where the inmates were housed.

19         This service like the traditional phone service

20   already provided by GTL would have been offered to inmates and

21   to their friends and families at a cost, potentially increasing

22   the monthly revenue of GTL which would have in turn increased

23   the monthly pay of Waggoner and the monthly kickback he was

24   paying to Epps.

25         Waggoner explained to Epps that he believed the video

1   services would increase the amount of money Waggoner and Epps

2   received each month.  Epps and Waggoner discussed justifying

3   this new service as a way to decrease the instances of the

4   introduction of contraband into MDOC facilities.

5        The evidence would show at least three specific

6   instances of Waggoner paying a cash bribe or kickback to Epps.

7   These occasions were sometime in or about April of 2014

8   Waggoner met Epps at a hotel in Natchez where Waggoner

9   delivered a bottle of Jack Daniels and about $2,400 in cash to

10  Epps from the money Waggoner was paid by GTL.

11       On or about July 30th, 2014, and again on or about

12  August 26 of 2014 Waggoner paid Epps cash kickbacks from the

13  money Waggoner was paid by GTL.  The evidence would show that

14  these events and circumstances occurred in whole or in part

15  within the Southern District of Mississippi.

16       THE COURT:  Mr. Waggoner, did you hear what

17  Mr. Gilbert had to say?

18       THE DEFENDANT:  Yes, your Honor.

19       THE COURT:  Do you disagree with anything that he

20  said?

21       THE DEFENDANT:  No, your Honor.

22       THE COURT:  So, Mr. Waggoner, let me now have you

23  express in your own words why you are guilty of the offense

24  that's charged in the criminal information.  How well did you

25  know Christopher Epps?

1    THE DEFENDANT:  What was the question about Epps?

2    THE COURT:  How well did you know him?

3    THE DEFENDANT:  I saw him once a month.  We didn't go

4    out to dinner or anything like that.  I knew him.  I've known

5    him a long time, 20 years probably, since he's been with the

6    DOC.

7    THE COURT:  And did you ever work for MDOC?

8    THE DEFENDANT:  No.  No, your Honor.

9    THE COURT:  So how did you come to know Mr. Epps?

10   THE DEFENDANT:  I guess associations, sir, different

11   meetings, state meetings, sheriffs' meetings, national

12   meetings.

13   THE COURT:  Did you know him when you held public

14   office?

15   THE DEFENDANT:  That wasn't me.

16   THE COURT:  Okay.

17   THE DEFENDANT:  That was my cousin.

18   THE COURT:  Okay.  Well, let me ask you then, did you

19   know him when your cousin held public office?

20   THE DEFENDANT:  Do I know him?

21   THE COURT:  Did you know him then?

22   THE DEFENDANT:  Sam W. Waggoner?

23   THE COURT:  No, no.  Did you know Mr. Epps during that

24   time period?

25   THE DEFENDANT:  Yes.  Yes, your Honor.

1          THE COURT:  And when you were working for GTL, what

2     was your position with GTL?

3          THE DEFENDANT:  Liaison between the Mississippi

4     Department of Corrections.

5          THE COURT:  And how long did you work for GTL?

6          THE DEFENDANT:  I've worked with them around 20 years,

7     23 years probably.  I did until last year.

8          THE COURT:  All right.  And who set up this financial

9     arrangement you had with GTL to be paid 5 percent of contract

10    price?

11         THE DEFENDANT:  Robert Orso with GTL and the

12    department of corrections.  He's the regional manager.

13         THE COURT:  All right.  And with regard to this scheme

14    with Christopher Epps, was it your idea or his idea?

15         THE DEFENDANT:  It was his idea, sir.

16         THE COURT:  And who made the determination as to how

17    much or what percentage he would get out of the deal?

18         THE DEFENDANT:  A mutual agreement I guess it was.

19         THE COURT:  All right.  And how exactly did it work

20    for you to be able to get that money?

21         THE DEFENDANT:  I would get a check from GTL and I

22    would take the 30 percent and then half that and then give the

23    other half to Mr. Epps.

24         THE COURT:  And this 30 percent would be applied

25    against what?

```
 1              THE DEFENDANT:  For taxes, reduction for taxes.  I had
 2   to pay taxes.
 3              THE COURT:  GTL would give you that money?
 4              THE DEFENDANT:  Tax money?
 5              THE COURT:  Who would give you the sum of money that
 6   you would utilize to pass on to Epps?
 7              THE DEFENDANT:  GTL would give me a 5 percent
 8   commission each month.
 9              THE COURT:  And would you take part of that money and
10   give to Mr. Epps?
11              THE DEFENDANT:  Yes, sir.
12              THE COURT:  And how did you ensure that you would have
13   moneys over and beyond that which you normally should get?
14   What I'm asking is is that the contract prices you had with the
15   department of corrections, who negotiated that contract price?
16              THE DEFENDANT:  The actual GTL contract with the
17   department of corrections?
18              THE COURT:  That's right.
19              THE DEFENDANT:  I think it was three or four agencies
20   within the department of corrections and they put it out for
21   bid.
22              THE COURT:  And was the bid a lawful bid?
23              THE DEFENDANT:  GTL's the largest inmate telephone
24   company in the United States.  So I'm sure it was.  I didn't
25   see that.  I wasn't involved in it.
```

1        THE COURT:  I need you to explain why you had to bribe

2  Christopher Epps on this matter.

3        THE DEFENDANT:  He wanted some of the money; and if I

4  didn't do it, I would lose some of my contracts and business in

5  my major business.

6        THE COURT:  So what you're telling me then is that the

7  bid that GTL made for the business was a legitimate deal.

8        THE DEFENDANT:  Yes, your Honor.

9        THE COURT:  You're telling me then that the profits

10  derived were legitimate profits.

11        THE DEFENDANT:  Legitimate profits.

12        THE COURT:  And you're telling me that the amount of

13  money that was paid to you on commission --

14        THE DEFENDANT:  Yes, sir.

15        THE COURT:  -- was a legitimate amount of money.

16        THE DEFENDANT:  Yes, your Honor.

17        THE COURT:  But you're telling me that unless you paid

18  part of your commission to Christopher Epps, that he threatened

19  to do something else.

20        THE DEFENDANT:  I take full responsibility for what I

21  did.  I don't know what his thinking was.

22        THE COURT:  All right.  But at the time that you paid

23  him you paid him under what impression?  Did you pay him under

24  threat or just voluntarily give him the money?

25        THE DEFENDANT:  My main business was CCI, and I did

1   business with the county, city jails in Mississippi.  And if

2   something would come up, they need -- a sheriff might ask me

3   for -- talk to Mr. Epps when I see him, for a cook in their

4   jail or a mechanic, and I would do that for the counties,

5   cities, and he would try to help.

6          THE COURT:  I still don't fully understand.  Why would

7   you need to bribe him if you had this money coming to you

8   lawfully?

9          THE DEFENDANT:  I did.

10         THE COURT:  So then why would you need to bribe him?

11         THE DEFENDANT:  He -- he told me to.  He -- he said he

12   wanted half of my commission each month.  But, again, I do take

13   responsibility --

14         THE COURT:  I understand.

15         THE DEFENDANT:  -- of doing that.

16         THE COURT:  But why would you pay him?  What would

17   happen if you didn't pay him?

18         THE DEFENDANT:  He would call a sheriff, say Leake

19   County Sheriff Waggoner, *Sheriff Waggoner, I want you to change*

20   *inmate phone companies or I will pull my state inmates out.*

21   And that was the main reason, something like that would happen.

22         THE COURT:  Well, did you have conversations directly

23   with him whereby he made such demands or threats?

24         THE DEFENDANT:  No.  No, your Honor.  I'd just -- I'd

25   seen what he had done to other people that said no.

1       THE COURT:  All right.  So then you're saying that he

2  told you how much money he wanted.

3       THE DEFENDANT:  He said he wanted to split it.  And

4  then I told him I was going to take taxes out and then split

5  that in half.  And we decided on that together.

6       THE COURT:  Well, then was your commission still

7  profitable for you after you did that, after you split it?

8       THE DEFENDANT:  Yes, your Honor.

9       THE COURT:  So what was your commission per year from

10 this engagement?

11      THE DEFENDANT:  108,000 -- 106,000 a year I think.

12      THE COURT:  So, now, were you splitting 106 or were

13 you splitting 212?  How did it work?

14      THE DEFENDANT:  106 minus -- times 30 percent and

15 subtract it by -- divide it by two.

16      THE COURT:  Okay.  Do that again.  100 and what now?

17      THE DEFENDANT:  $106,000.

18      THE COURT:  106.  Okay.  Now what?

19      THE DEFENDANT:  30 percent for taxes.

20      THE COURT:  30 percent of that.

21      THE DEFENDANT:  Then --

22      THE COURT:  One second.

23      THE DEFENDANT:  Yes, sir.

24   (PAUSE)

25      THE COURT:  Okay.  Taxes, what did you do with the

1  taxes?  That would come off of that?

2          THE DEFENDANT:  Yes.  My accountant would do all that.

3          THE COURT:  Okay.  Then what?

4          THE DEFENDANT:  Then we would divide the remainder by

5  two.

6          THE COURT:  Okay.  After you subtract those taxes,

7  then the rest would be divided by two.

8          THE DEFENDANT:  Yes, sir.

9          THE COURT:  Okay.  I come up with something north of

10  $35,000.  That's about right?  I just made some quick

11  calculations.

12      (COUNSEL AND DEFENDANT CONFERRED)

13          THE DEFENDANT:  It would be $54,000.

14          THE COURT:  54,000?

15          THE DEFENDANT:  108 is what I've got on this sheet and

16  we divided that.

17          THE COURT:  You said 106.  It's 108?

18          THE DEFENDANT:  108.

19          THE COURT:  Okay.

20          THE DEFENDANT:  For -- what year is this?

21          THE COURT:  108.  We're talking about one year.  Are

22  we talking about one year?

23          THE DEFENDANT:  Well, we -- we had this

24  conversation -- I don't know how to answer that.

25      (COUNSEL AND DEFENDANT CONFERRED)

1          MR. BAIN:  Your Honor, the numbers that he's presented

2    to me, there's a total of 309,000 for a period of a little over

3    three years.  And I'd be more than happy to submit this to the

4    court if you'd like to see his --

5          THE COURT:  Well, over three years.  You're saying in

6    a three-year period --

7          MR. BAIN:  $309,582.

8          THE COURT:  Okay.  And then you took one third for

9    taxes.

10          THE DEFENDANT:  30 percent.

11          THE COURT:  30 percent.  All right.

12          THE DEFENDANT:  I know what it is.  They have -- the

13    accountant included the CCI business along with this percentage

14    for the consultant together, and so -- I just saw that, your

15    Honor.

16          THE COURT:  All right.  So then at the end of the

17    calculations, your take-home over these three years would have

18    been about what?

19          THE DEFENDANT:  It would have been the same thing,

20    108,000.

21          THE COURT:  For the three-year period?

22          THE DEFENDANT:  Yes.  But they're also including my

23    other business, CCI, in it.  So it would make the total larger.

24    And I don't know how they came up with that.  But I agree with

25    whatever they say, though.

1   THE COURT:  Over that three-year period, then about

2   how much would Epps get?

3   THE DEFENDANT:  He -- I did it all -- total was 300

4   and -- 2011 it was 61,000 for -- that was not a full year.  In

5   '12 it was one hundred and five four hundred.  In '13 it was

6   one hundred and thirteen.  In 2014 until August -- so that's

7   three hundred and nine fifty-eight times 30.  And so we had

8   216,700 net.

9   THE COURT:  For yourself.

10   THE DEFENDANT:  Gross net and then divide by two, net,

11   108,353.70.

12   THE COURT:  So then Chris Epps over that three-year

13   period would have gotten how much?

14   THE DEFENDANT:  108,353.70.

15   THE COURT:  And what were you directed to do with his

16   money besides -- I mean, give it to him, but how would you --

17   how did you give it to him?

18   THE DEFENDANT:  It would be cash, sir.

19   THE COURT:  All right.  And were you directed to put

20   it in his hand or put it in any other form where he could pick

21   it up?  How were you delivering the money to him?

22   THE DEFENDANT:  When I was at his house, I'd just put

23   it on the counter by him.  And then if we're having lunch, I

24   would hand it to him.

25   THE COURT:  All right.  Did you have to have anybody

1    else involved in this scheme with you?

2              THE DEFENDANT:  No, your Honor.

3              THE COURT:  Okay.  Thank you.

4              THE DEFENDANT:  Yes, sir.

5              THE COURT:  So then when you gave him this money, you

6    understood you were violating the law?

7              THE DEFENDANT:  Yes, your Honor.

8              THE COURT:  And when you discussed all these matters

9    with your lawyer, are you satisfied that you have no defense to

10   that conduct?

11             THE DEFENDANT:  Yes, your Honor.

12             THE COURT:  So then with regard to the charge against

13   you contained in the criminal information, how do you plead,

14   guilty or not guilty?

15             THE DEFENDANT:  Guilty, your Honor.

16             THE COURT:  Mr. Waggoner, since you acknowledge

17   you're, in fact, guilty as charged in the criminal information,

18   since you know your rights to a trial, since you know what the

19   maximum possible punishment is and since you are voluntarily

20   pleading guilty, I will accept your plea of guilty as to the

21   single count of the criminal information and I hereby enter a

22   judgment of guilty against you as to that charge.  Twana.

23             THE CLERK:  November 5th.

24             THE COURT:  November 5.  I'm going to sentence you on

25   November 5, 2015, here in this courtroom.  That's November 5,

# EXHIBIT C

# PROJECT NUMBER 39019
## INMATE CALLING SERVICE AGREEMENT
### BETWEEN
## GLOBAL TEL*LINK CORPORATION
### AND
## MISSISSIPPI DEPARTMENT OF INFORMATION TECHNOLOGY SERVICES
### AS CONTRACTING AGENT FOR THE
## MISSISSIPPI DEPARTMENT OF CORRECTIONS

This Inmate Calling Service Agreement (hereinafter referred to as "Agreement") is entered into by and between Global Tel*Link Corporation, a Delaware corporation having its principal place of business at 2609 Cameron Street, Mobile, Alabama 36607 (hereinafter referred to as "Contractor"), and the Mississippi Department of Information Technology Services having its principal place of business at 301 North Lamar Street, Suite 508, Jackson, Mississippi 39201 (hereinafter referred to as "ITS"), as contracting agent for the Mississippi Department of Corrections located at 723 North President Street, Jackson, Mississippi 39202 (hereinafter referred to as "Customer"). ITS and Customer are sometimes collectively referred to herein as "State".

**WHEREAS,** Customer, pursuant to Request for Proposals ("RFP") Number 3527 requested proposals for the provision, installation and maintenance of an Inmate Calling Service ("System") for the inmates at the Mississippi State Penitentiary at Parchman, Mississippi, the Central Mississippi Correctional Facility at Pearl, Mississippi, the South Mississippi Correctional Institution at Leakesville, Mississippi, and the seventeen (17) Community Work Centers and four (4) Restitution Centers across the State of Mississippi (hereinafter referred to as the "Correctional Facilities"), and

**WHEREAS,** Contractor was the successful respondent in an open, fair and competitive procurement process to provide the above mentioned services;

**WHEREAS,** the State and Contractor have agreed to extend the arrangement initiated by RFP 3527, that was documented in a contract executed by the Parties in November 2007 ("Prior Contract").

**NOW THEREFORE,** in consideration of the mutual understandings, promises and agreements set forth, the parties hereto agree as follows:

## ARTICLE 1  PERIOD OF PERFORMANCE
Unless this Agreement is extended by mutual agreement or terminated as prescribed elsewhere herein, this Agreement shall begin on the date it is signed by all parties and shall continue in effect for sixty (60) months thereafter. At the end of the initial term, this Agreement may, upon the written agreement of the parties, be renewed for two (2) additional twelve (12) month terms. Sixty (60) days prior to the expiration of the initial term or any renewal term of this Agreement, Contractor shall notify Customer and ITS of the impending expiration and Customer shall have thirty (30) days in which to notify Contractor of its intention to either renew or cancel the Agreement.

Global Tel*Link Corporation-DOC-39019-3527-Dec2010-Inmate Calling Service

## ARTICLE 2  SCOPE OF SERVICES

**2.1**    Contractor shall provide, install and maintain a turnkey Inmate Calling Service, including a digital recording system, which meets or exceeds all of the specifications stated in RFP No. 3527 and Contractor's Proposal, as accepted by the State, in response thereto.  Contractor shall also provide a full-time, on-site investigative site administrator, Gang Management Module, and Cell Phone Detect Module.  All equipment and services shall be installed and fully functional by March 15, 2008, or within such other period as may be agreed to by the parties.

**2.2**    Contractor has caused a managed access solution for cellular telephones ("System") to be installed at Customer's Parchman facility, and will cause the System to be installed at the Central Mississippi Correctional Facility and the South Mississippi Correctional Institute as soon as equipment lead times and authorizations by wireless carriers and the Federal Communications Commission ("FCC") will allow, which Contractor expects will occur before May 31, 2011.

**2.3**    The System will assist the Customer in managing the unauthorized use of certain types of cellular telephones within those Customer facilities where the System has been installed ("Facilities").  The types of telephones managed by the System and the functions of the System are described in literature and manuals that have been provided to the Customer.

**2.4**    Contractor does not represent or warrant that the operation of the System will be error free or without interruption.  The Customer will be solely responsible for determining whether to alert employees or visitors at the Facilities that the System is in operation.

**2.5**    The deployment of the System is subject to the continued cooperation of each wireless carrier that offers services in the coverage area of the deployed System, and to authorizations granted by the FCC.

**2.6**    The Customer is solely responsible for determining which cellular telephones should be authorized for use at the Facilities and will enter the numbers for these telephones into the System.

**2.7**    If the Customer elects to make use of any of the System's voice or data transmission monitoring capabilities, including identifying wireless devices, or monitoring of the content of transmissions handled by the System (to the extent Contractor can lawfully make any such capabilities available to the Customer), the Customer shall be solely responsible for ensuring that its use of these capabilities is in accordance with applicable laws and regulations, including those relating to the interception and monitoring of voice and data communications and the protection of personal information.  Customer shall rely solely on its own legal counsel for determining compliance, and shall be solely responsible for any liability arising out of its failure to comply, with such laws and regulations.

**2.8**    The Customer will use the System in accordance with training and instructions supplied by Contractor or its vendor.

**2.9**    The Customer will immediately notify Contractor if it learns of a System malfunction or that the System coverage extends less or beyond the intended coverage area.

**2.10**    Contractor will be responsible for all maintenance and repair of the System, which may require in some instances that the System be deactivated.

**2.11**    Contractor or its licensors (as applicable) will retain all right, title, and interest in and to the System and its components, and nothing in the Agreement transfers to the Customer or ITS any right, title, or interest in or to the System or any of its components.

**ARTICLE 3   COMMISSIONS**
Contractor shall pay monthly commission payments to Customer totaling 60.5% percent of the gross monthly revenues. No deductions from the gross revenue shall be accepted by the Customer. Commissions must begin when the first telephone call is completed by an inmate at any of the Correctional Facilities. Payments of commissions shall be due and payable to the Customer within thirty (30) days of the closing of the billing cycle. It is understood by the parties that commission rates shall not decrease during the term of this Agreement. The call rates to be charged by Contractor to the friends and families of inmates when calls are placed by the inmates are set out in Exhibit A, which is attached hereto and incorporated herein by reference.

**ARTICLE 4 ACCEPTANCE TESTING**
**4.1**    Contractor must conduct an operational system test of the proposed system and certify, in writing, that the system is ready for acceptance testing and will perform in accordance with the requirements stated.  The Contractor must ensure that the system, in general, and each module of the system, in particular, operates according to specifications before turning the system over to Customer.  Contractor understands and agrees that Customer personnel will not debug modifications for the Contractor.

**4.2**    Customer will have ten (10) business days to test all aspects of the system to ensure it is functioning as specified.  If any aspect of the system fails to function as specified, the Contractor will be given five (5) business days to correct the malfunction.  The Customer will then have another ten (10) business days to accept the system.  If the Contractor fails to correct defects after a second five (5) day period, the Customer reserves the right to replace the system.

**4.3**    Acceptance testing shall not in any way relieve the Contractor of its responsibilities to correct any defect during the life of the Agreement.

**4.4**    Prior to final acceptance by Customer, the Contractor must have satisfactorily completed the training program for system administrators and inmates as specified in Article 5 below.

**ARTICLE 5 TRAINING**
**5.1**    Contractor will provide live, hands-on instruction with emphasis on all features and system

design, including the digital recording system ("DRS") for all system administrators within five (5) days prior to system cutover.

**5.2**    Contractor will provide training to three (3) Customer personnel at each Customer site as designated by Customer.  Training will include the management of day-to-day operations of the system, such as, but not limited to, adding, deleting, or changing inmates' personal identification numbers ("PIN") and inmates' allowed call telephone number lists; blocking numbers from being called by inmates; proper record keeping; and trouble reporting procedures.

**5.3**    Within two (2) weeks of cutover, Contractor will provide training to inmates on how to place collect calls. Training will include a live, hands-on demonstration on the steps necessary to place a collect call.

**5.4**    Contractor will have printed instructions on each inmate telephone instructing the inmates on how to place a collect call. Instructions will be printed in English and Spanish.

**5.5**    Contractor will have at least one (1) trainer on-site for retraining and consultation of inmates and system administrators for the first five (5) days after cutover.

## ARTICLE 6  EMPLOYMENT STATUS

**6.1**    Contractor shall, during the entire term of this Agreement, be construed to be an independent contractor. Nothing in this Agreement is intended to nor shall be construed to create an employer-employee relationship, or a joint venture relationship.

**6.2**    Contractor represents that it is qualified to perform the duties to be performed under this Agreement and that it has, or will secure, if needed, at its own expense, applicable personnel who shall be qualified to perform the duties required under this Agreement. Such personnel shall not be deemed in any way, directly or indirectly, expressly or by implication, to be employees of Customer.

**6.3**    Contractor shall pay when due, all salaries and wages of its employees and it accepts exclusive responsibility for the payment of federal income tax, state income tax, social security, unemployment compensation and any other withholdings that may be required. Neither Contractor nor employees of Contractor are entitled to state retirement or leave benefits.

**6.4**    It is further understood that the consideration expressed herein constitutes full and complete compensation for all services and performances hereunder, and that any sum due and payable to Contractor shall be paid as a gross sum with no withholdings or deductions being made by Customer for any purpose from said contract sum, except as permitted herein in the article titled "Termination".

## ARTICLE 7  BEHAVIOR OF EMPLOYEES/SUBCONTRACTORS

Contractor will be responsible for the behavior of all its employees and subcontractors while on the premises of the Correctional Facilities covered by this Agreement.  Any employee or subcontractor

acting in a manner determined by the administration of the Correctional Facility to be detrimental, abusive or offensive to any of the staff and/or inmates, will be asked to leave the premises and may be suspended from further work on the premises. All Contractor employees and subcontractors who will be working at such locations shall be covered by Contractor's comprehensive general liability insurance policy.

## ARTICLE 8  MODIFICATION OR RENEGOTIATION
This Agreement may be modified only by written agreement signed by the parties hereto, and any attempt at oral modification shall be void and of no effect. The parties agree to renegotiate the Agreement if federal and/or state revisions of any applicable laws or regulations make changes in this Agreement necessary.

## ARTICLE 9  ASSIGNMENT AND SUBCONTRACTS
9.1     Neither party may assign or otherwise transfer this Agreement or its obligations hereunder without the prior written consent of the other party, which consent shall not be unreasonably withheld. Any attempted assignment or transfer of its obligations without such consent shall be null and void. This Agreement shall be binding upon the parties' respective successors and assigns,

9.2     Contractor must obtain the written approval of Customer before subcontracting any portion of this Agreement. No such approval by Customer of any subcontract shall be deemed in any way to provide for the incurrence of any obligation of Customer in addition to the total fixed price agreed upon in this Agreement. All subcontracts shall incorporate the terms of this Agreement and shall be subject to the terms and conditions of this Agreement and to any conditions of approval that Customer may deem necessary.

9.3     Contractor represents and warrants that any subcontract agreement Contractor enters into shall contain a provision advising the subcontractor that the subcontractor shall have no lien and no legal right to assert control over any funds held by the Customer, and that the subcontractor acknowledges that no privity of contract exists between the Customer and the subcontractor and that the Contractor is solely liable for any and all payments which may be due to the subcontractor pursuant to its subcontract agreement with the Contractor. The Contractor shall indemnify and hold harmless the State from and against any and all claims, demands, liabilities, suits, actions, damages, losses, costs and expenses of every kind and nature whatsoever arising as a result of Contractor's failure to pay any and all amounts due by Contractor to any subcontractor, materialman, laborer or the like.

9.4     All subcontractors shall be bound by any negotiation, arbitration, appeal, adjudication or settlement of any dispute between the Contractor and the Customer, where such dispute affects the subcontract.

## ARTICLE 10 AVAILABILITY OF FUNDS
It is expressly understood and agreed that the obligation of Customer to proceed under this Agreement is conditioned upon the appropriation of funds by the Mississippi State Legislature and

the receipt of state and/or federal funds for the performances required under this Agreement. If the funds anticipated for the fulfillment of this Agreement are not forthcoming, or are insufficient, either through the failure of the federal government to provide funds or of the State of Mississippi to appropriate funds, or if there is a discontinuance or material alteration of the program under which funds were available to Customer for the payments or performance due under this Agreement, Customer shall have the right to immediately terminate this Agreement, without damage, penalty, cost or expense to Customer of any kind whatsoever. The effective date of termination shall be as specified in the notice of termination. Customer shall have the sole right to determine whether funds are available for the payments or performances due under this Agreement.

## ARTICLE 11 DEFAULT

The occurrence of any of the following shall constitute a default hereunder: (a) Contractor fails to pay monthly commissions as required in this Agreement; (b) Contractor shall breach any term of this Agreement and such breach continues for ten (10) days after Contractor receives written notice from the State, or (c) Contractor becomes the subject of bankruptcy, reorganization, liquidation or receivership proceedings, whether voluntary or involuntary.

## ARTICLE 12 TERMINATION

Notwithstanding any other provision of this Agreement to the contrary, this Agreement may be terminated by the State without the assessment of penalties as follows: (a) If Contractor defaults hereunder pursuant to Article 11 above, the State may terminate the Agreement upon the giving of ten (10) days written notice unless the breach is cured within said ten (10) day period, or (b) The State may terminate this Agreement upon the giving of ten (10) days written notice to Contractor if a court of competent jurisdiction finds that Contractor persistently disregards laws, ordinances, rules, regulations or orders of any public authority having jurisdiction, or (c) In the event of privatization of the correctional facility, the State may terminate this Agreement upon the giving of ten (10) days written notice to Contractor, or (d) The State may, upon the giving of one hundred and twenty (120) days written notice specifying the effective date thereof to Contractor, terminate this Agreement if it is determined by the State to be in its best interest to so terminate. The provisions of this Article do not limit either party's right to pursue any other remedy available at law or in equity.

## ARTICLE 13 GOVERNING LAW

This Agreement shall be construed and governed in accordance with the laws of the State of Mississippi and venue for the resolution of any dispute shall be Jackson, Hinds County, Mississippi. Contractor expressly agrees that under no circumstances shall Customer be obligated to pay an attorney's fee, prejudgment interest or the cost of legal action to Contractor. Further, nothing in this Agreement shall affect any statutory rights Customer may have that cannot be waived or limited by contract.

## ARTICLE 14 WAIVER

Failure of either party hereto to insist upon strict compliance with any of the terms, covenants and conditions hereof shall not be deemed a waiver or relinquishment of any similar right or power hereunder at any subsequent time or of any other provision hereof, nor shall it be construed to be a

modification of the terms of this Agreement. A waiver by the State, to be effective, must be in writing, must set out the specifics of what is being waived, and must be signed by an authorized representative of the State.

## ARTICLE 15 SEVERABILITY

If any term or provision of this Agreement is prohibited by the laws of the State of Mississippi or declared invalid or void by a court of competent jurisdiction, the remainder of this Agreement shall be valid and enforceable to the fullest extent permitted by law provided that the State's purpose for entering into this Agreement can be fully achieved by the remaining portions of the Agreement that have not been severed.

## ARTICLE 16 CAPTIONS

The captions or headings in this Agreement are for convenience only, and in no way define, limit or describe the scope or intent of any provision or Article in this Agreement.

## ARTICLE 17 HOLD HARMLESS

To the fullest extent allowed by law, Contractor shall indemnify, defend, save and hold harmless, protect and exonerate Customer, ITS and the State, its Board Members, officers, employees, agents and representatives from and against any and all claims, demands, liabilities, suits, actions, damages, losses, costs and expenses of every kind and nature whatsoever, including without limitation, court costs, investigative fees and expenses, attorney fees and claims for damages arising out of or caused by Contractor and/or its partners, principals, agents, employees or subcontractors in the performance of or failure to perform this Agreement.

## ARTICLE 18 THIRD PARTY ACTION NOTIFICATION

Contractor shall notify Customer in writing within five (5) business days of Contractor filing bankruptcy, reorganization, liquidation or receivership proceedings or within five (5) business days of its receipt of notification of any action or suit being filed or any claim being made against Contractor or Customer by any entity that may result in litigation related in any way to this Agreement and/or which may affect the Contractor's performance under this Agreement. Failure of the Contractor to provide such written notice to Customer shall be considered a material breach of this Agreement and the Customer may, at its sole discretion, pursue its rights as set forth in the Termination Article herein and any other rights and remedies it may have at law or in equity.

## ARTICLE 19 AUTHORITY TO CONTRACT

Contractor warrants that it is a validly organized business with valid authority to enter into this Agreement; that entry into and performance under this Agreement is not restricted or prohibited by any loan, security, financing, contractual or other agreement of any kind, and notwithstanding any other provision of this Agreement to the contrary, that there are no existing legal proceedings, or prospective legal proceedings, either voluntary or otherwise, which may adversely affect its ability to perform its obligations under this Agreement.

## ARTICLE 20 NOTICE

Any notice required or permitted to be given under this Agreement shall be in writing and personally delivered or sent by electronic means provided that the original of such notice is sent by certified United States mail, postage prepaid, return receipt requested, or overnight courier with signed receipt, to the party to whom the notice should be given at their business address listed herein. ITS' address for notice is: Mr. David L. Litchliter, Executive Director, Mississippi Department of Information Technology Services, 301 North Lamar Street, Suite 508, Jackson, Mississippi 39201. Customer's address for notice is: Ms. Audrey McAfee, IT Director, Mississippi Department of Corrections, 723 North President Street, Jackson, Mississippi 39202. The Contractor's address for notice is: Ms. Teresa Ridgeway, Executive Vice President of Administration, Global Tel*Link Corporation, 2609 Cameron Street, Mobile, Alabama 36607 Notice shall be deemed given when actually received or when refused. The parties agree to promptly notify each other in writing of any change of address.

## ARTICLE 21 RECORD RETENTION AND ACCESS TO RECORDS

Contractor shall establish and maintain financial records, supporting documents, statistical records and such other records as may be necessary to reflect its performance of the provisions of this Agreement. The Customer, ITS, any state or federal agency authorized to audit Customer, and/or any of their duly authorized representatives, shall have unimpeded, prompt access to any of the Contractor's books, documents, papers and/or records that are pertinent to this Agreement to make audits, examinations, excerpts and transcriptions at the Contractor's office where such records are kept during Contractor's normal business hours. All records relating to this Agreement shall be retained by the Contractor for three (3) years from the date of receipt of final payment under this Agreement. However, if any litigation or other legal action, by or for the state or federal government has begun that is not completed at the end of the three (3) year period, or if an audit finding, litigation or other legal action has not been resolved at the end of the three (3) year period, the records shall be retained until resolution.

## ARTICLE 22 INSURANCE

Contractor represents that it will maintain workers' compensation insurance as prescribed by law which shall inure to the benefit of Contractor's personnel, as well as comprehensive general liability and employee fidelity bond insurance. Contractor will, upon request, furnish Customer with a certificate of conformity providing the aforesaid coverage.

## ARTICLE 23 DISPUTES

Any dispute concerning a question of fact under this Agreement which is not disposed of by agreement of the Contractor and Customer, shall be decided by the Executive Director of ITS or his/her designee. This decision shall be reduced to writing and a copy thereof mailed or furnished to the parties. Disagreement with such decision by either party shall not constitute a breach under the terms of this Agreement.  Such disagreeing party shall be entitled to seek such other rights and remedies it may have at law or in equity.

## ARTICLE 24 COMPLIANCE WITH LAWS

Contractor shall comply with, and all activities under this Agreement shall be subject to, all

Customer policies and procedures, and all applicable federal, state, and local laws, regulations, policies and procedures as now existing and as may be amended or modified. Specifically, but not limited to, Contractor shall not discriminate against any employee nor shall any party be subject to discrimination in the performance of this Agreement because of race, creed, color, sex, age, national origin or disability.

**ARTICLE 25 CONFLICT OF INTEREST**
Contractor shall notify the Customer of any potential conflict of interest resulting from the representation of or service to other clients. If such conflict cannot be resolved to the Customer's satisfaction, the Customer reserves the right to terminate this Agreement.

**ARTICLE 26 SOVEREIGN IMMUNITY**
By entering into this Agreement with Contractor, the State of Mississippi does in no way waive its sovereign immunities or defenses as provided by law.

**ARTICLE 27 CONFIDENTIAL INFORMATION**
**27.1**   Contractor shall treat all Customer data and information to which it has access by its performance under this Agreement as confidential and shall not disclose such data or information to a third party without specific written consent of Customer. In the event that Contractor receives notice that a third party requests divulgence of confidential or otherwise protected information and/or has served upon it a subpoena or other validly issued administrative or judicial process ordering divulgence of such information, Contractor shall promptly inform Customer and thereafter respond in conformity with such subpoena to the extent mandated by state and/or federal laws, rules and regulations. This Article shall survive the termination or completion of this Agreement and shall continue in full force and effect and shall be binding upon the Contractor and its agents, employees, successors, assigns, subcontractors or any party or entity claiming an interest in this Agreement on behalf of, or under the rights of the Contractor following any termination or completion of this Agreement.

**27.2**   With the exception of any attached exhibits which are labeled as "confidential", the parties understand and agree that this Agreement, including any amendments and/or change orders thereto, does not constitute confidential information, and may be reproduced and distributed by the State without notification to Contractor. ITS will provide third party notice to Contractor of any requests received by ITS for any such confidential exhibits so as to allow Contractor the opportunity to protect the information by court order as outlined in ITS Public Records Procedures.

**ARTICLE 28 EFFECT OF SIGNATURE**
Each person signing this Agreement represents that he or she has read the Agreement in its entirety, understands its terms, is duly authorized to execute this Agreement on behalf of the parties and agrees to be bound by the terms contained herein. Accordingly, this Agreement shall not be construed or interpreted in favor of or against the State or the Contractor on the basis of draftsmanship or preparation hereof.

## ARTICLE 29 ENTIRE AGREEMENT

**29.1** This contract constitutes the entire agreement of the parties with respect to the subject matter contained herein and supersedes and replaces any and all prior negotiations, understandings and agreements, written or oral, between the parties relating thereto. The RFP No. 3527 and Contractor's Proposal in response to RFP No. 3527 are hereby incorporated into and made a part of this Agreement. The Exception Summary is attached hereto as "Exhibit B" and incorporated herein by reference.

**29.2** The contract made by and between the parties hereto shall consist of, and precedence is hereby established by the order of the following:

**A.** This Agreement signed by the parties hereto;
**B.** Any exhibits attached to this Agreement;
**C.** RFP No. 3527 and written addenda, and
**D.** Contractor's Proposal, as accepted by Customer, in response to RFP No. 3527.

**29.3** The intent of the above listed documents is to include all items necessary for the proper execution and completion of the services by the Contractor. The documents are complementary, and what is required by one shall be binding as if required by all. A higher order document shall supersede a lower order document to the extent necessary to resolve any conflict or inconsistency arising under the various provisions thereof; provided, however, that in the event an issue is addressed in one of the above mentioned documents but is not addressed in another of such documents, no conflict or inconsistency shall be deemed to occur by reason thereof. The documents listed above are shown in descending order of priority, that is, the highest document begins with the first listed document ("A. This Agreement") and the lowest document is listed last ("D. Contractor's Proposal").

## ARTICLE 30 STATE PROPERTY

Contractor shall be responsible for the proper custody of any Customer-owned property furnished for Contractor's use in connection with work performed pursuant to this Agreement. Contractor shall reimburse the Customer for any loss or damage, normal wear and tear excepted.

## ARTICLE 31 SURVIVAL

Articles 13, 17, 21, 26, 27, and all other articles which, by their express terms so survive or which should so reasonably survive, shall survive any termination or expiration of this Agreement.

## ARTICLE 32 DEBARMENT AND SUSPENSION CERTIFICATION

Contractor certifies that neither it nor its principals: (a) are presently debarred, suspended, proposed for debarment, declared ineligible or voluntarily excluded from covered transactions by any federal department or agency; (b) have, within a three (3) year period preceding this Agreement, been convicted of or had a civil judgment rendered against them for commission of fraud or a criminal offense in connection with obtaining, attempting to obtain or performing a public (federal, state or local) transaction or contract under a public transaction; violation of federal or state anti-trust statutes

or commission of embezzlement, theft, forgery, bribery, falsification or destruction of records, making false statements or receiving stolen property; (c) are presently indicted of or otherwise criminally or civilly charged by a governmental entity with the commission of fraud or a criminal offense in connection with obtaining, attempting to obtain or performing a public (federal, state or local) transaction or contract under a public transaction; violation of federal or state anti-trust statutes or commission of embezzlement, theft, forgery, bribery, falsification or destruction of records, making false statements or receiving stolen property, and (d) have, within a three (3) year period preceding this Agreement, had one or more public transaction (federal, state or local) terminated for cause or default.

## ARTICLE 33 COMPLIANCE WITH ENTERPRISE SECURITY POLICY

Contractor and Customer understand and agree that all products and services provided by Contractor under this Agreement must be and remain in compliance with the State of Mississippi's Enterprise Security Policy. The parties understand and agree that the State's Enterprise Security Policy is based on industry-standard best practices, policy, and guidelines at the time of contract execution. The State reserves the right to introduce a new policy during the term of this Agreement and require the Contractor to comply with same in the event the industry introduces more secure, robust solutions or practices that facilitate a more secure posture for the State of Mississippi.

## ARTICLE 34 LIQUIDATED DAMAGES

**34.1**    Contractor shall provide Customer quarterly statements of rates being charged for all telephone calls to serve as an audit. These reports are due to Customer by the 15th of the month following the end of the calendar quarter. Holidays are not an exception. Such reports are to be sent to: Mr. Rick McCarty, Mississippi Department of Corrections, 723 North President Street, Jackson, Mississippi 39201. At the sole discretion of Customer, liquidated damages of $250.00 per day may be assessed Contractor for each calendar day the reports are late.

**34.2**    The Contractor must allow all inmate telephones to be in use simultaneously, i.e., phones to outgoing communications lines must be on a one-to-one basis. At the sole discretion of Customer, liquidated damages in the amount of $500.00 per day per Customer site may be assessed Contractor for failure to maintain this one-to-one ratio. The liquidated damages will continue until such time as the one-to-one ratio is achieved.

**34.3**    Contractor shall certify monthly (with the delivery of the commission check) as to the quantity of phones and lines. In the event the Contractor fails to provide this certification or in the event the report is found to be falsified, the Customer may, in its sole discretion, assess Contractor liquidated damages in the amount of $1,000.00 per day per Customer site until such time as the ratio is corrected or the certification is provided.

**34.4**    Customer will notify the Contractor when the population of a prison increases to warrant additional phones and associated lines. Contractor will have seventeen (17) business days from receipt of such notification to install the additional lines and phones. In the event of a delay in the installation of the additional phones and lines, the Customer may, in its sole discretion, assess

Global Tel*Link Corporation-DOC-39019-3527-Dec2010-Inmate Calling Service

Contractor liquidated damages in the amount $500.00 per day until such time as the phones and lines are installed.

**34.5**   The Contractor shall provide and maintain a minimum of one (1) telephone per twenty (20) inmates at all Customer sites, excluding maximum security lockdown. At the sole discretion of Customer, liquidated damages in the amount of $500.00 per day per Customer sites may be assessed for failure to maintain this ratio. The liquidated damages will continue until such time as the Contractor remedies the ratio.

**34.6**   Contractor shall submit a usage report electronically to Customer by the tenth (10th) of each month with such report including, but not being limited to, the following information: (a) date and time of calls; (b) telephone numbers; (c) number of messages; (d) number of minutes; (e) usage revenue, and (f) totals on messages, minutes, and revenues. The information must be available by PIN, cellblock and by Customer site. In the event of a delay in the delivery of the usage report, the Customer may, in its sole discretion, assess Contractor liquidated damages in the amount of $500.00 per day until such time as the usage report is delivered to Customer.

**34.7**   Contractor shall deliver commission payments to Customer by the thirtieth (30th) day after the closing of each billing cycle. In the event of a delay in the delivery of the commission payments, the Customer may, in its sole discretion, assess Contractor liquidated damages in the amount of $1,000.00 per day for until such time as the commission payment is delivered to Customer.

**34.8**   Upon request of Customer, the Contractor shall provide, at no cost to Customer, a report reflecting Contractor's gross revenue for any specified time period, within five (5) days of Customer's request for same. In the event of a delay in the delivery of this report, the Customer may, in its sole discretion, assess Contractor liquidated damages in the amount of $500.00 per day until such time as the report is delivered to Customer.

**34.9**   Contractor shall deliver a commission report to Customer by the thirtieth (30th) day of each month with such report specifying the number of minutes used and revenue generated per telephone. In the event of a delay in the delivery of the commission report, the Customer may, in its sole discretion, assess Contractor liquidated damages in the amount of $500.00 per day until such time as the commission report is delivered to Customer.

**34.10**   If any discrepancies are found between commissions quoted or if any errors are made in the calculation of those commissions, the Customer will only accept the greatest revenue potential. Customer will notify Contractor within thirty (30) days of receipt of the commission report if there is a question regarding the validity of the commissions. The Contractor will then have thirty (30) calendar days from receipt of such notification to negotiate a mutually acceptable conclusion. If the Contractor fails to negotiate a mutually acceptable conclusion within such thirty (30) calendar day period, the Customer may, in its sole discretion, assess Contractor liquidated damages in the amount of $1,000.00 per day beginning with day 31, until such time as a mutually satisfactory agreement is reached.

**34.11**   In the event the Contractor fails to meet the maintenance and support requirements specified in RFP No. 3527, the Customer may, in its sole discretion, assess Contractor liquidated damages in the amount of $500.00 per hour, with a one hour minimum, for every hour the requirements are not met.

**34.12**   The Contractor understands and agrees that the provision of inmate calling services is considered to be critical.  In addition to the specific situations set forth above in Articles 34.1 through 34.11, in the event the Contractor at any time fails to meet the terms and conditions of this Agreement, the Customer may, in its sole discretion, assess Contractor liquidated damages in the amount of $1,500.00 per day until such time as the failure is deemed corrected by Customer.

## ARTICLE 35 STATUTORY AUTHORITY
By virtue of Section 25-53-21 of the Mississippi Code Annotated, as amended, the executive director of ITS is the purchasing and contracting agent for the State of Mississippi in the negotiation and execution of all contracts for the acquisition of information technology equipment, software and services. The parties understand and agree that ITS as contracting agent is not responsible or liable for the performance or non-performance of any of Customer's or Contractor's contractual obligations, financial or otherwise, contained within this Agreement.

## ARTICLE 36 RECORDING DISCLAIMER
Contractor and Customer agree and stipulate that Contractor has no responsibility to advise Customer with respect to any applicable law, regulation, or guideline that may govern or control telephone call recordation or monitoring by Customer or compliance therewith.  Customer has its own legal counsel to advise it concerning any and all such applicable law, regulation, or guideline, and compliance therewith.  Contractor disclaims any responsibility to provide, and in fact has not provided, Customer any legal advice concerning such applicable law, regulation, or guideline, or compliance therewith.

## ARTICLE 37 COMPLETED ITEMS
The Parties acknowledge that most of the provisions contained in this Agreement carry over from the Prior Contract, and that requirements within some of these provisions have been accomplished, including training obligations on the part of the Contractor and other items that would have been completed during the early stages of the Prior Contract.

For the faithful performance of the terms of this Agreement, the parties hereto have caused this Agreement to be executed by their undersigned authorized representatives.

**State of Mississippi, Department of Information Technology Services, on behalf of Mississippi Department of Corrections**

By: _David L. Litchliter_
       **Authorized Signature**

Printed Name: David L. Litchliter

Title: Executive Director

Date: _1-13-11_

**Mississippi Department of Corrections**

By: _Christopher B. Epps_
       **Authorized Signature**

Printed Name: Christopher Epps

Title: Commissioner

Date: _1/12/11_

**Global Tel*Link Corporation**

By: _Jeffrey B. Haidinger_
       **Authorized Signature**

Printed Name: Jeffrey B. Haidinger

Title: President, Services

Date: _12/20/10_

REVIEWED BY
MDOC LEGAL COUNSEL

JAN 1 2 2010
APPROVED FOR SIGNATURE

## EXHIBIT A

### Call Rate

|  | Per Call Charge | Per Minute Charge |
|---|---|---|
| Local, IntraLata/Intrastate, InterLata/Intrastate, Interstate | $2.10 | $0.24 |

Global Tel*Link Corporation-DOC-39019-3527-Dec2010-Inmate Calling Service

**EXHIBIT B**
Exception Summary

| ITS RFP Reference | Vendor Proposal Reference | Brief Explanation of Exception | ITS Acceptance (sign here only if accepted) |
|---|---|---|---|
| (Reference specific outline point to which exception is taken) | (Page, section, items in Vendor's proposal where exception is explained) | (Short description of exception being made) | |
| 1. RFP page 10. Section III Vendor Information, Item 17. Rights Reserved to Use Existing Product Contracts | This exception is explained on the pages immediately following this table. See EXCEPTION 1 page 8. | GTL's commission proposal is based on the State utilizing the equipment and products provided with our proprietary turnkey LazerPhone system. However, should the State wish to purchase additional peripheral equipment, GTL will work with the State to integrate such items as additional computers, printers, etc. | The State accepts this exception |
| 2. RFP page 17. Section IV Legal & Contractual Information. Item 28. Ownership of Developed Software; Point 28.1 | This exception is explained on the pages immediately following this table. See EXCEPTION 2 page 8. | GTL retains all copyright and patent rights to our LazerPhone platform and all features and functionality contained therein, including any new LazerPhone features, functions, or enhancements developed by GTL and provided to the MDOC during the course of our contract with the MDOC. | The State accepts this exception and notes that no software is being developed pursuant to this Agreement and thus the exception does not apply to this procurement. |
| 3. RFP page 17. Section IV Legal & Contractual Information. Item 29. Ownership of Custom Tailored Software | This exception is explained on the pages immediately following this table. See EXCEPTION 3 page 8. | GTL retains all copyright and patent rights to our LazerPhone platform and all features and functionality contained therein, including any LazerPhone features, functions, or enhancements developed or tailored at the request of MDOC during the course of our contract with the MDOC. | The State accepts this exception and notes that no software is being developed pursuant to this Agreement and thus the exception does not apply to this procurement. |
| 4. RFP page 18. Section IV Legal & Contractual Information. Item 30. Terms of Software License | This exception is explained on the pages immediately following this table. See EXCEPTION 4 page 9. | The State's license to the LazerPhone software is limited to the term of the contract with GTL and any extensions thereof. | The State accepts this exception |

Global Tel*Link Corporation-DOC-39019-3527-Dec2010-Inmate Calling Service

| | | | |
|---|---|---|---|
| 5. RFP page 55. Section VII Technical Specifications; Item 8.5 Commissions. Item 8.5.9.2. and page 83, Exhibit A: Standard Contract, Item 32.10 | This exception is explained on the pages immediately following this table. See EXCEPTION 5 page 9. | GTL must take exception to the imposition of a penalty on a situation that GTL may be incapable of controlling. However, in the event of a dispute, GTL agrees to work with MDOC beyond any deadline set for the completion of mediation in order to reach a mutually-agreeable decision. | The State does not accept this exception. |
| 6. RFP page 65. Section VII Technical Specifications; Section 15 Other Requirements, Item 15.3 and Article 32.10 of Exhibit A, Standard Contract. | This exception is explained on the pages immediately following this table. See EXCEPTION 6 page 10 | GTL understands the importance of the ICS to MDOC and GTL stands behind the delivery and quality of its product and service. GTL will agree and comply with this liquated damage term for all failures of GTL's product and services caused by GTL or its subcontractors that are not otherwise compensable under one of the other liquated damages provisions herein. | The State does not accept this exception. |

Global Tel*Link Corporation-DOC-39019-3527-Dec2010-Inmate Calling Service